Opinion by Judge O’SCANNLAIN; Dissent by Judge SCHROEDER.
OPINION
O’SCANNLAIN, Circuit Judge:
We consider whether a police officer has used constitutionally excessive force by repeatedly deploying an electronic control device — commonly known as a “taser”— against a combative suspect and whether the manufacturer of that device has provided sufficient warning that its repeated use may lead to death.
I
A
Early in the morning of July 28, 2007, Lydia Marquez was roused from her sleep by the sounds of “yelling ... and cussing” coming from a spare bedroom in her Phoenix, Arizona, home. Inside were her son Ronald, her granddaughter Cynthia, and her great-granddaughter Destiny. A few days earlier, Cynthia had suffered a head injury in a car accident, causing her to make odd statements about her relationships with God and the devil. Concerned about what was happening, Lydia knocked on the bedroom door. When the screaming stopped, she returned to sleep. Shortly thereafter, Lydia awoke again to sounds of “praying and yelling.” Sensing that there was “something wrong, something bad going on,” Lydia went to the nearby home of a relative and called the police.
Officer Joshua Roper was the first to arrive. He began to gather details from members of the Marquez family while he waited outside the home for Officer David Guliano, who was en route. The officers learned that Ronald was attempting to perform an exorcism on three-year-old Destiny, but that (so far as his relatives knew) he had no weapons. The officers radioed for instructions, but after they heard “a little girl screaming and crying like she [was] in severe pain or something [was] torturing her,” they decided they could not wait.
With Lydia’s assistance, the officers entered the house and proceeded to the bedroom door. The screaming continued. Officer Roper drew his TASER X26 ECD (“X26”), an electronic control device manufactured by defendant-appellee TASER International, Inc. (“TASER”);[1] Officer Guliano drew his service pistol. At the door, they identified themselves as police officers. The shouting intensified until the officers could no longer hear Destiny. Concerned for the child’s safety, the officers decided to enter the bedroom but were unable to open the door because a bed had been shoved in front of the aperture. Using their combined body weight, the men were eventually able to force the door partially open at an angle. Roper, *1171 who was taller, clambered into the room through this gap.
He was greeted by chaos. The relatively small bedroom was cluttered with two beds, a dresser, and a large TV stand. The walls and furniture were smeared with blood. A malfunctioning air conditioning unit left the room sweltering. Shirtless, the heavy-set Ronald reclined on the larger bed with the now silent and motionless Destiny in a choke-hold, his hands hidden. Cynthia — who at 19 was quite a large woman — was naked in the corner screaming. Her face showed evidence of a recent beating. It was later discovered that Ronald had gouged her eye in an attempt to exorcize her demons.
Officer Roper ordered Ronald to “[l]et go of the child or I’m going to tase you.” When Ronald did not comply, Roper deployed the X26 in “probe mode.” Two darts shot from the front of the X26 and lodged in Ronald’s left side. If it had performed as intended, the X26 would have incapacitated Ronald by overriding his central nervous system through a series of electrical pulses. But the X26 functions properly in this mode only if the darts are separated by at least four inches. This would have required Roper to have been standing at least seven feet from Ronald, but the cramped conditions in the bedroom made that impossible. As a result, the X26 did not appear to affect Ronald as intended. Nevertheless, Roper pulled the trigger a second time. When this discharge also appeared not to work, Roper removed the cartridge and tested the X26 to see if it was functioning. While he was doing so, Officer Guliano — who had not yet been able fully to enter the room— extracted Destiny through the partially open door. He passed her into the arms of a waiting relative before joining Officer Roper inside the bedroom.
At this point, Ronald kicked Roper in the thighs and groin. Roper decided to apply the X26 in “drive-stun mode.” Deployed thus, a user removes the cartridge from the X26 and places the weapon’s exposed electrodes in direct contact with the skin. “Drive-stun mode” does not incapacitate the target, but instead encourages the suspect to comply by causing pain. Over the next three minutes, Officers Roper and Guliano each tried to use Roper’s X26 in this mode, but Ronald was flailing so wildly that they were never sure that they made good contact. They testified that most of the charge either went into the air or into the officers themselves as they passed the single X26 to each other. Even when they did make contact, the weapon seemed to have no effect on Ronald.'
After the officers finally wrestled Ronald into submission, they turned to Cynthia, who was by then trying to assault Roper. It took two or three minutes and two deployments of the X26 to subdue her. When officers returned their attention to Ronald, they found that he had a weak pulse. Despite resuscitation efforts, Ronald went into cardiac arrest and died.
Dr. Kevin Horn performed the autopsy. Unlike in many cases of in-custody deaths, the only evidence of controlled substances in Ronald’s system was marijuana metabolites. Dr. Horn did, however, discover that Ronald suffered from heart disease. Ronald’s body also showed signs of a struggle with “multiple, incidental” “[c]ontusions and abrasions.” He had seven sets of burns consistent with “drive-stuns” from an X26 and two probes embedded in his lower left chest. Dr. Horn listed the cause of death as “excited delirium.” He listed “hypertensive/atheroselerotic cardiovascular disease” as a contributing condition, but made no mention of the X26 in a similar role.
Subsequent investigation demonstrated that the officers pulled the X26’s trigger a *1172 combined 22 times, but the discharges were not the uniform five-second cycle associated with the weapon.[2] It is unclear how long the X26 was in contact with Ronald while discharging.
B
The Marquez family (“Marquezes”) brought this lawsuit. They sued TASER as the manufacturer of the X26 on a state-law, strict liability theory of failure to warn. They asserted that TASER should have warned that repeated exposure to its products could lead to sudden death due to cardiac failure, particularly among those who are obese, mentally ill, or intoxicated. They also sued Officers Roper and Guliano for (1) excessive force in violation of the Fourth Amendment pursuant to 42 U.S.C. § 1983 and (2) state-law wrongful death.[3] Each party moved for summary judgment.
The district court granted summary judgment in favor of TASER after concluding that its warnings at the time of Ronald’s death were sufficient as a matter of law. The district court also concluded that the officers’ repeated use of the X26 was reasonable given that “the officers were confronted with an individual suspected of serious crimes, who was a potential threat, and who, by all accounts, was resisting arrest.”
The Marquezes timely appealed.
II
A
In challenging the district court’s summary judgment order, the Marquezes first contend that the district court focused too much on TASER’s warning about the risks associated with prolonged exposures to its products. In 2007, TASER provided the general warning that while its “weapons [are] designed to incapacitate a person from a safe distance while reducing the likelihood of serious injuries or death,” officers needed “to remember that the very nature of use of force ... involves a degree of risk that someone will get hurt or may even be killed due to physical exertion, unforeseen circumstances, and individual susceptibilities.” TASER further warned that “[i]n some circumstances, in susceptible people, it is conceivable that the stress and exertion of extensive repeated, prolonged, or continuous application(s) of the TASER device may contribute to cumulative exhaustion, stress, and associated medical risk(s).”[4] TASER further warned that one of the risks associated with “exhaustive exertion” was Sudden In-Custody Death Syndrome.[5] The district court determined that these warnings “capture[d] the circumstances of this case” and were thus sufficient as a matter of law.
The Marquezes point to TASER’s additional warning that, “[u]nrelated to TA *1173 SER exposure, conditions such as excited delirium, severe exhaustion, drug intoxication or chronic drug abuse, and/or overexertion from physical struggle may result in serious injury or death.” The Marquezes contend that the inclusion of this additional language rendered TASER’s warnings about prolonged exposure to its products equivocal and thereby inadequate.
Under Arizona law, “[wjhere a warning is required, the warning must be reasonably readable and apprise a consumer exercising reasonable care under the circumstances of the existence and seriousness of the danger sufficient to enable the consumer to protect himself against it.” Brown v. Sears, Roebuck & Co., 136 Ariz. 556, 667 P.2d 750, 757 (Ariz.Ct.App.1983).
TASER’s warnings meet this standard. In addition to warning that its products should generally be used with care, TASER specifically warned that “[w]hen practical, [officers should] avoid [using] prolonged or continuous exposure(s) to the TASER device’s electrical discharge” because “in susceptible people it is conceivable that the stress and exertion of extensive repeated, prolonged or continuous application(s) of the TASER device may contribute to cumulative exhaustion, stress, and associated medical risk(s).” The warning also explains that one of the medical risks associated with exhaustion is Sudden In-Custody Death Syndrome. These warnings cover precisely what happened here. We are unpersuaded by the Marquezes’ request that we read one piece of TASER’s warnings out of context.
B
The Marquezes also suggest that TASER should have provided a more specific warning that certain populations may be at an increased risk of death when exposed to its products. In determining whether a warning provides enough detail, we must “be sensitive to many factors” because “excessive detail may detract from the ability of typical users and consumers to focus on the important aspects of the warnings.” Restatement (Third) of Torts: Products Liability § 2 cmt. i (1998); cf. Powers v. Taser Int’l, Inc., 217 Ariz. 398, 174 P.3d 777, 781-82 (Ariz.Ct.App.2007) (noting that, absent controlling case law, the Arizona courts will look to the Restatement of Torts). When a case involves idiosyncratic reactions—usually an allergy but in this case an unusual reaction to the application of an electronic control device—a warning is required only “when the harm-causing [aspect of the product] is one to which a substantial number of people” would be subject. Restatement (Third) of Torts: Products, Liability § 2 cmt. k.
TASER could have provided a stronger warning that specifically addressed risks faced by vulnerable populations. (A manufacturer can always provide more information.) But further detail could have detracted from officers’ ability to process the warning that was given. Id. at cmt. i. And the Marquezes have neither shown that a “substantial number” of people were affected by the alleged idiosyncratic reaction nor explained what language they would have preferred. Id. Thus, we agree with the district court that such warning was sufficient as a matter of law.[6]
Ill
This brings us to the Marquezes’ § 1983 claims against Officers Roper and Guliano. The Marquezes assert that they presented a triable issue of fact that the *1174 officers’ use of force was unreasonable. The Marquezes do not dispute that Roper was justified in deploying his X26 in order to rescue Destiny, but they contend that any justification for the use of force dissipated once Destiny was at a safe distance.
“Determining whether the force used to effect a particular seizure is reasonable under the Fourth Amendment requires a careful balancing of the nature and quality of the intrusion on the individual’s Fourth Amendment interests against the countervailing governmental interests at stake.” Graham v. Connor, 490 U.S. 386, 396, 109 S.Ct. 1865, 104 L.Ed.2d 443 (1989) (internal quotation marks omitted). We undertake this inquiry with great caution, making “allowance[s] for the fact that police officers are often forced to make split-second judgments — in circumstances that are tense, uncertain, and rapidly evolving — about the amount of force that is necessary in a particular situation.” Id. at 396-97, 109 S.Ct. 1865. While the existence of less forceful options to achieve the governmental purpose is relevant, “[p]oliee officers ... are not required to use the least intrusive degree of force possible.” Forrester v. City of San Diego, 25 F.3d 804, 807-08 (9th Cir.1994); see also Gregory v. County of Maui, 523 F.3d 1103, 1107 (9th Cir.2008).
A
First, we must consider the amount of force and the extent to which that force intruded on Ronald’s Fourth Amendment rights. Mattos v. Agarano, 661 F.3d 433, 441 (9th Cir.2011) (en banc). Regardless of how much force is involved in a single application of an X26, we agree that considerable force was used here. Cf. Smith v. City of Hemet, 394 F.3d 689, 700 (9th Cir.2005) (en banc) (noting that all claims of force are analyzed under the Graham standard (citing Ward v. City of San Jose, 967 F.2d 280, 284 (9th Cir.1992))).
The record supports the inference that Ronald received nine five-second cycles from the X26: two while it was ineffectively deployed in “probe mode” and seven when it was deployed in “drive-stun mode.”[7] He was also wrestled into submission by two policemen. Together, these constituted a not-insignificant potential intrusion upon Ronald’s Fourth Amendment rights. See Scott v. Henrich, 39 F.3d 912, 915 (9th Cir.1994).
B
Next, we balance Ronald’s Fourth Amendment interests against the governmental interests at stake. Key to this inquiry are “the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of officers or others, and whether he is actively resisting or attempting to evade arrest by flight.” Graham, 490 U.S. at 396, 109 S.Ct. 1865. But this list is not comprehensive. Instead, we examine the totality of the circumstances, including whatever fac *1175 tors may be relevant in a particular case. See Bryan v. MacPherson, 630 F.3d 805, 818 (9th Cir.2010). For example, we have stated that if the police were summoned to the scene to protect a mentally ill offender from himself, the government has less interest in using force. Drummond ex rel. Drummond v. City of Anaheim, 343 F.3d 1052, 1058 (9th Cir.2003). By contrast, if the officer warned the offender that he would employ force, but the suspect refused to comply, the government has an increased interest in the use of force. See Deorle v. Rutherford, 272 F.3d 1272, 1284 (9th Cir.2001).
Here the relevant factors favor a finding that this use of force was reasonable. Once Roper and Guliano traversed Ronald’s barricade, they were greeted by a blood-spattered room, an injured adult, and a child in evident distress. This alone was cause to believe that at least one serious crime had occurred. As a result, this case is easily distinguished from the only instance in which we have found the use of an electronic control device to be unreasonable — where officers deployed the device in “probe mode” against two unarmed women, who had committed (at most) minor infractions and who were not actively resisting arrest. Mattos, 661 F.3d at 445. It also renders inapposite those cases in which police are summoned to protect mentally disturbed individuals from themselves. See, e.g., Drummond, 343 F.3d at 1058.
Ronald — who was warned that he would be “tased” if he did not comply — was also actively resisting arrest. Though the Marquezes allege that any apparent resistance was, in fact, involuntary muscle spasms caused by the X26, they have offered no proof. By contrast, Officers Roper and Guliano have consistently testified that Ronald was actively struggling, pushing his knees into his body so that he could use his feet both to lever himself off the bed and to kick the officers. For example, he kicked Roper in the groin after he removed the cartridge and before Roper began redeploying it (when, under the Marquezes’ own theory, there should have been no X26-induced movement). Nothing “in the record, such as medical reports, contemporaneous statements by the officer [or] the available physical evidence,” Gregory, 523 F.3d at 1106-07 & n. 3, undermines the officers’ credibility. Indeed, the autopsy — the only available medical evidence — shows numerous incidental contusions and is consistent with a prolonged struggle. In light of this evidence, the Marquezes may not rely on mere allegations to defeat summary judgment. Id.
For similar reasons, the officers could reasonably have thought that Ronald posed an immediate risk to Cynthia. We “have [repeatedly] observed that ‘[t]he volatility of situations involving domestic violence’ makes them particularly dangerous.’ ” Mattos, 661 F.3d at 450 (alteration in original) (quoting United States v. Martinez, 406 F.3d 1160, 1164 (9th Cir.2005)). While Ronald was clearly not hitting Cynthia while he was choking Destiny, the Marquezes do not explain why the officers could not reasonably have thought that she would be his next target if they left given her visible injuries and the amount of blood in the room.
Furthermore, the officers could reasonably have believed that they were themselves in danger. Officers are well aware that more of their colleagues are injured on domestic violence calls than on any other sort. Id. As a result, “[w]hen officers respond to a domestic abuse call, they understand that violence may be lurking and explode with little warning.” Id. (internal quotation marks omitted). Roper has consistently stated that Ronald began assaulting him as soon as Guliano had removed Destiny (that is, before Guliano himself entered the room). And the Mar *1176 quezes’ suggestion that Roper simply disengage and leave is unrealistic. Roper would have had to expose himself to further injury as he tried to squeeze his body through a partially open door that was angled into the room. Officers would then have had to force their way back into the room to arrest Ronald or to help Cynthia if she needed it.
In summary, although the officers used significant force in this case, it was justified by the considerable government interests at stake.[8]
TV
Finally, the Marquezes argue that the district court improperly granted summary judgment on their state law claims against the officers for wrongful death. Because we conclude that the officers acted reasonably in using force, this claim cannot succeed under Arizona law unless (1) the use of the X26 constituted “deadly force,” and (2) the use of deadly force was not justified. Compare Ariz. Rev. Stat. § 13-M09 (providing law enforcement officers with immunity for all reasonable uses of non-deadly force), with Ariz. Rev. Stat. § 13-410 (requiring an additional showing to immunize the use of deadly force).
We are not convinced that the use of an X26 involves deadly force. Arizona law defines “deadly physical force” as: “force that is used with the purpose of causing death or serious physical injury or in the manner of its use or intended use is capable of creating a substantial risk of causing death or serious physical injury.” Ariz. Rev. Stat. § 13-105(14). The Marquezes point to no case either in Arizona or in federal courts finding use of any electronic control device to be deadly force. And they have produced no evidence that an X26 is capable of creating a substantial risk of death or serious physical injury. At most there is evidence in the form of scientific journals that it carries a potential risk of injury in a very small group of people.
But even if the X26 did qualify as “deadly force” — a matter we need not decide— no reasonable jury could find that the circumstances here failed to justify the use of deadly force. The use of deadly force is permissible under Arizona law if an officer reasonably believes that it is necessary to “effect an arrest or prevent the escape from custody of a person whom the peace officer reasonably believes ... is likely to endanger human life or inflict serious bodily injury to another unless apprehended without delay.” Ariz. Rev. Stat. § 13-410(C)(2)(c); see also Garcia v. United *1177 States, 826 F.2d 806, 812 & n. 14 (9th Cir.1987) (applying Arizona law under Federal Tort Claims Act to conclude that an officer was justified in using deadly force to prevent a “felonious and deadly assault” on himself by a suspect attacking him with a stick and a rock) (citing Ariz. Rev. Stat. § 13-410). No reasonable jury could find that Marquez was unlikely to endanger human life or inflict serious bodily injury if not subdued: at first, he would not release his granddaughter from a choke-hold, then he struggled viciously in close quarters against the officers attempting to restrain him, and his daughter, who had also been the victim of his attacks, remained in the room throughout. Thus, the district court properly awarded summary judgment on this claim.
AFFIRMED.
APPENDIX
[[Image here]]
*1178 [[Image here]]
*1179 [[Image here]]
*1180 [[Image here]]

. TASER is an acronym for "Thomas A. Swift’s Electric Rifle.” See Jeffrey D. Ho, et al., Absence of Electrocardiographic Change After Prolonged Application of a Conducted Electrical Weapon in Physically Exhausted Adults, 41 J. Emergency Med. 466, 469 (2009).

. If an officer pulls and releases the trigger on the X26, it will discharge for five seconds. The discharge may be lengthened by continuing to depress the trigger after five seconds ends. It can be shortened by flipping a safety switch. The X26 discharges in this case were as short as one second and as long as eleven.

. The Marquezes also sued the City of Phoenix, but they have abandoned that claim on appeal.

. The complete warning in effect at the time of Ronald’s death is reproduced in the Appendix to this opinion.

. Because we affirm the district court's conclusion that this warning was sufficient, we need not reach TASER's alternative arguments for affirming the summary judgment award.

.Rather than a specific medical condition, this “syndrome” is the term used to describe when an individual dies while in police custody of unknown causes. The phenomenon has been the target of much scientific study for more than a decade. Cf., Mann v. Taser Int’l Inc., 588 F.3d 1291, 1299 n. 4 (11th Cir.2009) (citing Carolyn B. Robinowitz, Report of the Counsel on Science and Public Health 453 (2009)).

. The Marquezes assert that Ronald was, in fact, shocked more than twenty times. While the X26’s data recording system does show that the trigger was depressed 22 times, Officers Roper and Guliano have consistently testified that most of these discharges were into the air. In light of this testimony, the Marquezes must bring forth more than mere allegations to survive summary judgment. See Gregory, 523 F.3d at 1106 n. 3. "[CJarefully examining] all the evidence in the record, such as medical reports, contemporaneous statements by the officer and the available physical evidence,” Scott v. Henrich, 39 F.3d 912, 915 (9th Cir.1994), we conclude that Ronald received, at most, seven full “drive-stun” cycles of the X26 (one for each set of bum marks found at his autopsy). Similar review indicates that the officers ended their use of the X26 after Ronald was in handcuffs. The Marquezes’ assertions to the contrary rely entirely on an inaccurate transcription of Officer Roper’s interview with Phoenix’s Professional Standards Bureau.

. Because we conclude that there was no constitutional violation here, we need not reach the district court's alternative conclusion that the officers were entitled to qualified immunity because any violation of the Fourth Amendment was not clearly established at the time of the incident. Cf. Pearson v. Callahan, 555 U.S. 223, 236, 129 S.Ct. 808, 172 L.Ed.2d 565 (2009). We do note, however, our recent discussion in Maitos. As that case makes clear, as late as 2006 there was no case law even suggesting — let alone clearly establishing — that the use of an electronic control device on an individual suspected of domestic violence who was actively resisting arrest violated the Constitution. Cf. Mattos, 661 F.3d at 452 (noting that there was not even sufficient case law clearly to establish that using an electronic control device against the alleged victim of domestic violence violated the Constitution). While this incident occurred several months later, there were no intervening legal developments, which would have placed any possible violation that occurred in this case “beyond debate.” Ashcroft v. al-Kidd, - U.S. -, 131 S.Ct. 2074, 2083, 179 L.Ed.2d 1149 (2011). See generally Cockrell v. City of Cincinnati, 468 Fed.Appx. 491, 495 (6th Cir.2012) (unpublished) (collecting cases and concluding that as of 2009 courts had granted qualified immunity whenever "plaintiffs [were] tased while actively resisting arrest by physically struggling with, threatening, or disobeying officers”).